

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00324-CV

**IN THE INTEREST OF E.M.A.**, a Child

From the 216th Judicial District Court, Kerr County, Texas
Trial Court No. 22611A
Honorable Robert J. Falkenberg, Judge Presiding

Opinion by:     Rebeca C. Martinez, Chief Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Irene Rios, Justice[1]
                Beth Watkins, Justice[2]

Delivered and Filed: October 23, 2024

AFFIRMED

This appeal arises from the trial court's order, signed after a bench trial, that terminates the parental rights of appellant B.S. ("Mother"), the biological mother of E.M.A. ("Child").[3] In Mother's first, second, third, and fourth issues, she argues that the evidence is legally and factually insufficient to support the trial court's findings that: (1) Mother allowed Child to remain in a physically or emotionally dangerous condition or surrounding (subsection (1)(D) endangerment by conditions or surroundings); (2) Mother engaged in conduct or knowingly placed Child with

---

[1] Justice Irene Rios concurs in judgment only.
[2] Justice Beth Watkins concurs in judgment only.
[3] We refer to E.M.A. and E.M.A.'s family members by pseudonyms in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

persons who engaged in conduct which endangers the physical or emotional well-being of Child (subsection (1)(E) endangerment by conduct); (3) Mother failed to comply with specific provisions of a court order (subsection (1)(O) failure to comply with court order); and (4) termination of Mother's parental rights is in the best interest of Child (subsection (2) best interest).  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D)–(E), (O), (b)(2).  In Mother's fifth issue, she argues that (5) the trial court abused its discretion in making its conservatorship finding upon a legally and factually insufficient termination order.  We affirm.

## I. BACKGROUND

In September 2022, the Texas Department of Family and Protective Services (the "Department") initiated the underlying proceeding by filing a petition to terminate the parental rights of Mother and G.A. ("Father"), the biological father of Child.  Thereafter, the trial court signed an "Order for Protection of a Child in an Emergency" that, among other things, appointed the Department as Child's "temporary sole managing conservator."  Mother signed a family service plan, and it was adopted and incorporated into a court order.  Meanwhile, Child was placed with foster parents ("Foster Parents").

The Department's request to terminate the parent-child relationship proceeded to a bench trial.  At the April 2024 trial, the trial court considered the testimony of: (1) Mother; (2) Father; (3) Jimmie Dresden Mitchell, an investigations supervisor with the Department's Kerrville office; (4) Natalie Kissoon, M.D., a pediatrician; (5) Joni Chavez-Martell, a licensed professional counselor; (6) Katerina Lewis, a permanency specialist; and (7) Friend, one of Mother's friends. Father and Mother were each represented by separate counsel.

**A. Early Incidents of Domestic Violence Before Child's Birth**

At the time Mother and Father began dating, Mother had a daughter from a prior relationship ("Half Sibling"), and Father had three children from a prior relationship. Mother recalled three instances of domestic violence before Child was born. First, in September 2020, Mother pulled on Father's shirt, and he slammed her hand on the wall. Second, on Thanksgiving Day 2021, Father choked Mother; in response, Mother "put a knife to him." Third, Mother recalled an unspecified incident of domestic violence in March 2022, when Mother was approximately six months pregnant with Child.

**B. First Incident of Domestic Violence Upon Child's Arrival**

The couple began living together sometime in 2022, and Child was born premature in the middle of June 2022. Child remained in the neonatal intensive care unit ("NICU") for approximately two weeks. Shortly after Child came home, the couple had another incident of domestic violence. Mother and Father provided varying accounts of this incident. However, both agree that the incident started because Father did not purchase baby formula for Child, Father's three other children and Father's mother ("Paternal Grandmother") were in the living room of the couple's apartment during the incident, and Mother slammed the door to the couple's bedroom that adjoined the living room. The force of the door slamming caused a picture frame to fall off the living room wall and onto the head of one of Father's children.

According to Father, Mother then locked herself in the couple's bedroom, where Child was in his bassinet. Father gained entry to the bedroom through a bathroom that opened to both the living room and bedroom. Mother had picked up Child off of his bassinet, and she was cradling Child in her arms. Father simultaneously grabbed Child with one hand and with the other began choking Mother, but Mother held onto Child tighter. Father did not know why Mother had picked

up Child, but he characterized Mother's action as "us[ing] [Child] as a shield." The two fought over Child for a minute or two, and Child began to cry a little bit. Father eventually gained control of Child and placed him on the bed next to the couple. Father then continued choking Mother. Next, Paternal Grandmother entered the bedroom, took Child away from the couple, and told Father to calm down. The fight ended when Father walked away.

Mother denied using Child as a shield. Instead, she insisted that she picked up Child to feed him. As Father began choking Mother, Mother took one hand off Child, hit Father's shoulder with her free hand, and asked Father "[h]ow can you do that with him in my arms?" Otherwise, Mother did not scream or fight back because, as Mother stated, "[y]ou fight back, it gets worse." Mother denied squeezing Child hard. Instead, when Father "yanked" at Child, Mother let go of Child, and Father placed Child on the bed next to them. As the incident was ending, Mother told Father that she was going to call the police. Mother followed through on calling the police. They took photographs of her neck, but she did not press charges.

Father, Paternal Grandmother, and Father's three other children stayed at a hotel after the incident. After three days, the couple reconciled, Father moved back into the apartment, and the couple was intent on making their relationship work. Mother explained that she allowed Father to move back into the apartment because she is "big on family."

C.     **First Two Months of Child's Life**

On July 5, 2022, when Child was approximately three weeks old, Child's face turned purple after eating. Mother took Child to the emergency room at Peterson Hospital, but its healthcare providers refused to treat Child because he had been born premature and instead sent them to Methodist Children's Hospital in San Antonio, Texas. Child was diagnosed with reflux, prescribed Pepcid, and discharged on July 7.

On July 12, 2022, Child was seen by his pediatrician for a follow up on the Pepcid's effectiveness. The only thing the pediatrician told Mother was that he increased Child's Pepcid prescription.

On August 9, 2022, Mother took Child to the emergency room at Peterson Hospital because he was fussy and not eating. Mother was concerned that Child was dehydrated because he had neither fed from his bottle nor urinated for a while. The healthcare providers administered fluid through an IV and performed a sonogram. They placed Child stomach first on Mother's lap to administer the IV. Mother noticed that, when Child's back was exposed, Child had four or five different bruises on his back. Mother took pictures. Mother emphasized that the bruises appeared in the emergency room and that they were not present before Child went to the emergency room.

On August 10, 2022, Child began choking on his dose of Pepcid. Mother put her finger down Child's throat, and he vomited. Friend called for emergency medical services ("EMS"), and they examined Child.

On August 18, 2022, Child was examined by his pediatrician for his two-month wellness exam. Father accompanied Mother and Child to the two-month wellness exam. Nothing was out of the ordinary at this exam, except what Mother described as "markings" that occurred "[e]very few days" and lasted only a day.

**D.    Child's Significant Injuries**

After Child's two-month exam, Mother left for her job at 3:30 p.m., and Father stayed home to care for Child. Father testified that, after Mother left for work, he put Child on the sofa to change his diaper. At this point, Father noticed something was wrong because Child was "all tensed up. He had his knees [] up like trying to refuse [Father] from putting on the diaper." Father tapped Child's knees to get him to put them down, then Child "went limp." Father quickly put

Child's diaper on, picked him up, rubbed his chest, and tried to wake him. Father looked for any sign of consciousness, but all he could see was Child breathing. Father called for EMS, and then he called Mother. Mother got to the couple's apartment shortly after EMS arrived. EMS transported Child to Peterson Hospital.

Healthcare providers at Peterson Hospital performed a computed tomography scan ("CT scan") of Child's head, and they determined that Child's brain was bleeding. Child's condition necessitated transfer to Methodist Children's Hospital in San Antonio. Dr. Kissoon evaluated Child shortly after he was admitted to the NICU at Methodist Children's Hospital, and she diagnosed Child with subdural hemorrhages, an oral injury, a bruise on his left calf, a bone fracture to his tibia, factures to his first and second ribs that were in a healing phase, bilateral retinal hemorrhages, cerebral palsy, a seizure disorder, and a global developmental delay. Dr. Kissoon generally explained that Child's injuries were more likely caused by trauma, and she ruled out several potential causes. Indeed, Mother recalled that a neurologist had advised her that Child suffered from "shaken baby syndrome."

Dr. Kissoon noted that both of Child's retinas were bleeding and that he had a "disconjugate gaze, meaning his eyes did not move together, so they moved separate, independent of each other." Dr. Kissoon explained that the retina is the part of the eye that senses light. A review of Child's medical records provided no indication that he had any problems with his vision during his first two months. However, Child's retinal hemorrhaging caused Dr. Kissoon to be concerned that Child could become blind. Retinal hemorrhaging is generally caused by rapid acceleration and deceleration. Shaking an infant is one example of a force that may cause retinal hemorrhaging.

Child's fractures, bruising, and oral injury were, according to Dr. Kissoon, more likely caused by trauma. She explained Child's rib fractures could not have been caused by EMS

personnel because they did not perform chest compressions. Nothing during Mother's pregnancy would have caused Child's bruises, intracranial hemorrhages, and fractures. The results of laboratory tests ordered by Dr. Kissoon excluded any potential underlying bleeding disorder and metabolic bone disease that could have possibly explained Child's bruising and injuries. Dr. Kissoon explained that Child's choking episodes were also unlikely to cause his oral injury. Although Mother putting her finger in Child's mouth to help alleviate his choking may have caused an oral injury, it was unlikely. Dr. Kissoon explained that oral tissue heals rapidly, and that after a choking episode "that happened ten days prior[,] I would not expect it to look as red and raw as it did at the time of the evaluation" at Methodist Children's Hospital and that "the appearance of the injury suggests that it was more recent than ten days."

In addition to physical injuries, Dr. Kissoon diagnosed Child with developmental delays. Dr. Kissoon explained that a global developmental delay is a delay in all aspects of development: motor, feeding, social, and cognitive. Dr. Kissoon contrasted Child's global developmental delay with his diagnosis of cerebral palsy in that cerebral palsy is limited to motor skills. Dr. Kissoon observed that Child's delay in his motor skills is exhibited in him not rolling over, and she characterized that Child's motor skills were delayed "by a lot." Child's feeding skills were so delayed that some of his healthcare providers were considering placing a "G-tube" to help provide him with nutrition. This concerned Dr. Kissoon because it means that Child is unable to eat on his own.

By July 2023, Child's developmental delays and physical condition necessitated physical, occupational, speech, and vision therapies.

**E.      Investigations**

On the evening of August 18, 2022, healthcare providers at Peterson Hospital informed law enforcement that they were concerned Child's condition was the result of child abuse. Indeed, Mother was questioned by a detective at Peterson Hospital before Child was transferred to Methodist Children's Hospital. Mitchell testified that neither Mother nor Father was forthcoming with Peterson Hospital healthcare providers about Child's injuries. Mitchell further testified that the Department determined that Mother was an alleged perpetrator of abuse. Mitchell explained that part of the Department's criteria for physical abuse is preventing another from causing serious injury to a child.

In early September 2022, while Child was still receiving treatment at Methodist Children's Hospital, Father was arrested on a charge of injury to a child. Father testified that, while in jail, he arranged for Paternal Grandmother to provide Mother with pain medication because Mother suffered from back pain. Father acknowledged that Mother did not have a prescription for this pain medication and that Mother also sold some of this pain medication. Also while in jail, Father communicated with Mother via phone calls and text messages. Father testified that Mother used Father's cellphone and an alias to communicate with him hoping that the Department would not realize that the two had remained in contact. Over the course of these jailhouse conversations, the couple discussed a potential engagement, their relationship, and staying together while Father served his prison term. However, they never discussed Child. Father also communicated with Mother's sister ("Maternal Aunt"), and he told Maternal Aunt that he loved her. However, Father was jealous when he believed that Mother was speaking to other people while he was in jail.

After Father was released from jail pending trial, he began living with Maternal Aunt because the Department did not want him residing with Mother. Nevertheless, Father and Mother

continued their relationship, but they tried to keep the Department from learning about it. For example, the couple met in Maternal Aunt's backyard and discussed moving to Fredericksburg. On Valentine's Day 2023, Father proposed to Mother and gave her an engagement ring. According to Father, Mother accepted his wedding proposal.

In September 2023, Father pleaded guilty to injury to a child. A trial court sentenced Father to ten years' imprisonment, and he began serving his prison term. In October 2023, the couple got into an argument that prompted Father to disclose the couple's relationship to Lewis.

From April 2023 through December 2023, Chavez-Martell provided individual counseling services to Mother. Chavez-Martell testified that Mother was not honest in counseling sessions because Mother insisted that her relationship with Father was over when it was not. Chavez-Martell cited three specific instances. First, in April 2023, the Department informed Chavez-Martell that the couple communicated through jail phone calls.[4] Second, the couple had been seen riding in the same vehicle, but Mother denied the accounting Chavez-Martell had received. Third, in November 2023, Chavez-Martell learned that Father had attended a birthday party for Half Sibling at Mother's home. Father attended Half Sibling's birthday party even though Half Sibling was afraid of Father. During the birthday party, the couple fought and Mother's father ("Maternal Grandfather") wanted to call the police.

If Chavez-Martell had known about the couple's continued relationship, she would have altered her treatment plan by diving deeper into why Mother was continuing to be romantically involved with Father. Mother stopped attending counseling in December 2023. Chavez-Martell did not discharge Mother from individual counseling, and she opined that Mother would have benefited from further individual counseling.

---

[4] The Department was privy to recordings of these calls and shared their existence with Chavez-Martell.

For her part, Mother acknowledged being dishonest to Lewis and Chavez-Martell about her continued relationship with Father. She also acknowledged her engagement to Father. However, she broke off the engagement because, at the time, she was technically married to another man. Mother testified that she lied to Father about her willingness to "wait for him to get out of jail." As for drug abuse, Mother denied using prescription medication that was not prescribed to her. However, she admitted that three years earlier, she used opioids — hydrocodone, tramadol, and oxycontin — two-to-three times a day. She procured these drugs "on the streets." Mother admitted to being addicted to these narcotics until, one day, she woke up and stopped using narcotics without any formal treatment. Mother insisted that she had been "clean" for three years. She emphasized that she was last prescribed a narcotic — Tylenol with codeine — in November 2023 for a tooth infection.

Mother testified that, if given custody of Child, she would learn about his future healthcare needs. Friend testified that she is in a relationship with Mother's "ex" and is the stepmother to Half Sibling. Mother and her ex have, according to Friend, a good co-parenting relationship. Mother loves Child "with everything in her being." Friend personally witnessed one of Child's choking incidents, and she noted that Mother did everything she could to help Child.

## F. Trial Court's Disposition

At the trial's conclusion, the trial court found by clear and convincing evidence that: (1) Mother allowed Child to remain in a physically or emotionally dangerous condition or surrounding (subsection (1)(D) endangerment by conditions or surroundings); (2) Mother engaged in conduct or knowingly placed Child with persons who engaged in conduct which endangers the physical or emotional well-being of Child (subsection (1)(E) endangerment by conduct); (3) Mother failed to comply with specific provisions of a court order (subsection (1)(O) failure to comply with court

order); and (4) termination of Mother's parental rights is in the best interest of Child (subsection (2) best interest). *See id*. § 161.001(b)(1)(D)–(E), (O), (b)(2). The trial court signed an order that terminated Mother's parental rights and appointed the Department as Child's permanent managing conservator.

Mother timely appeals from the termination order.[5]

## II. DISCUSSION

### A. Standard of Review

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and that termination is in a child's best interest. *See id.* § 161.001(b)(1), (2). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007.

We review the legal and factual sufficiency of the evidence under the standards of review established by the Texas Supreme Court in *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002). In reviewing the legal sufficiency of the evidence, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id*. at 266. "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id*. In reviewing the factual sufficiency of the evidence, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited

---

[5] The termination order also terminated the parental rights of Father. Father does not appeal, and he is not a party to this appeal.

in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

**B.     Law on Endangerment**

Subsection 161.001(b)(1)(D) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]"  TEX. FAM. CODE ANN. § 161.001(b)(1)(D).  Subsection (E) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."  *Id.* § 161.001(b)(1)(E). Endangerment means to expose to loss or injury, to jeopardize.  *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam).

"While both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment."  *In re N.M.R.*, No. 04-22-00032-CV, 2022 WL 3640223, at *3 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied) (mem. op.).  "Subsection (D) concerns the child's living environment, rather than the conduct of the parent, though parental conduct is certainly relevant to the child's environment."  *Id.* (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).  Under subsection (E), the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission.  *In re J.T.G.*, 121 S.W.3d at 125.

In certain instances, the evidence supporting the trial court's finding of subsection (D) endangerment is intertwined and overlaps with the evidence supporting the trial court's subsection

(E) endangerment finding. *Id*. at 131. In such instances, we may consolidate our review of the evidence supporting these findings. *Id*.; *see also In re J.J.V.M.M.*, No. 04-22-00405-CV, 2022 WL 17479144, at *2 (Tex. App.—San Antonio Dec. 7, 2022, no pet.) (mem. op.) (consolidating examination of subsections (D) and (E) findings).

**C.      Endangerment Analysis**

Mother argues that the evidence supporting the trial court's findings under subsections (D) and (E) is legally and factually insufficient in two aspects. First, Mother contends that evidence of Father's endangering acts constitutes no evidence that Mother directly endangered Child. Second, Mother contends that "a great deal of evidence was merely conclusory." The Department responds by arguing that Mother's history of exposing Child to domestic violence and maintaining a violent relationship despite Department and law enforcement involvement establishes a conscious disregard for the safety and emotional well-being of Child. This conscious disregard, according to the Department, supports termination under subsections (D) and (E).

In *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.), our sister court succinctly explained:

> Evidence of domestic violence may be considered as evidence of endangerment under subsection (E). A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being. Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. Violent conduct by a parent toward the other parent may produce an environment that endangers the physical or emotional well-being of a child.

*Id*. (internal citations omitted).

As noted above, Mother recalled three instances of domestic violence before Child was born. First, in September 2020, Mother pulled on Father's shirt, and he slammed her hand on the wall. Second, on Thanksgiving Day 2021, Father choked Mother; in response, Mother "put a knife

to him." Third, Mother recalled an unspecified incident of domestic violence in March 2022, when Mother was approximately six months pregnant with Child.

The domestic violence that preceded Child's birth continued after he was born. When Child was approximately two weeks old, the couple engaged in yet another incident of domestic violence. While Mother and Father agree that Mother picked up Child as the incident was escalating, Mother disputes Father's characterization of Mother using Child as a "shield." Even if Mother did not use Child as a physical "shield," the trial court, as the factfinder tasked with reconciling the varying accounts, may have concluded that Mother picking up Child in that emotionally charged moment was endangerment by conduct under subsection (E). *See id*.; *see also In re J.F.C.*, 96 S.W.3d at 266 ("[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so.").

All these instances of domestic violence inform our review of the evidence surrounding the August 18 incident. Before August 18, Father had engaged in at least three instances of domestic violence with Mother. Nevertheless, Mother did not believe that Father would hurt "his own flesh and blood," and she left Child alone with Father on August 18. At trial, Mother was asked: "So did you place [Child] in harm by remaining in the relationship with [Father]?" She answered, "[y]es." Even after Child's diagnosis of "shaken baby syndrome" and the other conditions Dr. Kissoon detailed, Mother continued a relationship with Father. This continued relationship included inviting Father to a birthday party for Half Sibling. Mother's birthday party invitation concerned Chavez-Martell because Mother exposed Half Sibling to Father, who Chavez-Martell characterized as an abuser. This exposure, according to Chavez-Martell, exhibited a lack of protective behavior on Mother's part. Indeed, Chavez-Martell detailed that the couple fought at the birthday party, and that fight prompted Maternal Grandfather to want to call the police. With

the birthday party incident, the trial court heard of at least four specific instances of domestic violence. In light of all this evidence, the trial court, as the factfinder, may have concluded that Mother endangered Child by placement under subsection (D).

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we conclude a reasonable factfinder could have formed a firm belief or conviction that Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" and "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Thus, the evidence is legally sufficient to support this finding. Further, after considering the entire record, including any disputed or contrary evidence, we conclude the evidence is factually sufficient to support the trial court's termination under subsections (D) and (E) of the Texas Family Code. Mother's first and second issues are overruled.[6]

## D. Law on Best Interest

It is the burden of the party seeking termination to establish that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. In a best interest analysis, we apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[7] The set

---

[6] In light of our disposition of Mother's first and second issues, we need not address Mother's third issue. *See In re D.B.S.*, No. 05-20-00959-CV, 2021 WL 1608497, at *7 (Tex. App.—Dallas Apr. 26, 2021, pet. denied) (mem. op.) ("Because the evidence is legally and factually sufficient to support the endangerment findings, we need not address the finding on subsection (O).").

[7] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

of factors is not exhaustive, and no single factor is necessarily dispositive of the issue. *Id*. at 372; *Int. of A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

We recognize there is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, promptly and permanently placing a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). Thus, we also consider the factors set forth in section 263.307(b) of the Family Code. *Id*. § 263.307(b). Additionally, evidence that proves one or more statutory grounds for termination may be probative of a child's best interest, but it does not relieve the Department of its burden to prove best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

In conducting a best interest analysis, we consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Additionally, a factfinder may measure a parent's future conduct by her past conduct in determining whether termination of parental rights is in the child's best interest. *Id*. In analyzing the evidence within the *Holley* framework, evidence of each *Holley* factor is not required before a court may find that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27.

## E. Best Interest Analysis

"Evidence of domestic violence in the home is supportive of a trial court's best-interest finding under the third, fourth, and seventh *Holley* factors: the emotional and physical danger to the child now and in the future, parental abilities, and stability of the home." *In re R.J.*, 579 S.W.3d 97, 116 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *see also In re C.H.*, 89 S.W.3d at 28 ("While it is true that proof of acts or omissions under section 161.001[b](1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both

issues."). As we have already detailed, the trial court heard of at least five specific instances of domestic violence that occurred before and after Child sustained significant injuries on August 18. In the incident that occurred when Child was approximately two weeks old, both biological parents agree that Mother picked up Child as that domestic violence incident was escalating. Moreover, after Child had sustained significant injuries and Father was awaiting trial on a charge of injury to a child, Mother invited Father to Half Sibling's birthday, the couple fought, and the trial court could have reasonably concluded that the fight was so serious that it prompted Maternal Grandfather to want to call the police. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) ("A fact finder in a termination case may permissibly infer that a parent's future conduct may well be measured by recent deliberate past conduct as it relates to the same or a similar situation."). Accordingly, the trial court may have reasonably formed a firm belief or conviction that the third, fourth, and seventh *Holley* factors favored termination. *See id.*

By July 2023, Child's developmental delays and physical condition necessitated physical, occupational, speech, and vision therapies. Mother understood Child's therapy schedule. She elaborated that the therapist advised her "[t]o help him roll over, help him sit, try to get him to start talking" and "massage his legs, massage his body, his ribs, like, his whole body to get the muscles untightened." Mother emphasized that, if given custody of Child, she would learn about his future healthcare needs. Friend testified as to Mother caring for Child by recalling one of Child's choking incidents and noting that Mother did everything she could to help Child. In *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied), our sister court reviewed the sufficiency of the evidence of the second *Holley* factor — present and future emotional and physical needs — in a case where the "[m]other does not fully comprehend the [c]hild's medical needs or what is necessary to care for the [c]hild." It found that the mother's lack of understanding

of the child's medical needs, together with other evidence, was sufficient to support the factfinder's determination that the second *Holley* factor weighed in favor of termination. *Id*. at 204–05. In contrast, in this case, Mother demonstrated an understanding of Child's current therapeutic needs and a desire to learn about his future healthcare needs. Accordingly, the second *Holley* factor weighs against termination.

After viewing all the evidence in the light most favorable to the best-interest finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in Child's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. While evidence as to Child's present and future emotional and physical needs (the second *Holley* factor) weighs in favor of maintaining the parent-child relationship, the emotional and physical danger to Child now and in the future, parental abilities, and stability of the home (the third, fourth, and seventh *Holley* factors), weigh in favor of termination. *See In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio Jul. 25, 2018, pet. denied) (mem. op.) ("Evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when the evidence shows the parental relationship endangered the child's safety."). We further conclude that any disputed evidence, viewed in light of the entire record, could have been reconciled in favor of the trial court's best-interest finding or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in Child's best interest. *See id*. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Mother's fourth issue is overruled.

**F.      Conservatorship**

In Mother's fifth issue, she argues that the trial court abused its discretion in making its conservatorship finding upon a legally and factually insufficient termination order.  We review the trial court's appointment of a nonparent as sole managing conservator for an abuse of discretion, and we will reverse that appointment only if we determine it is arbitrary or unreasonable.  *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).  Having determined the evidence is legally and factually sufficient to support the termination of Mother's parental rights, we further hold the trial court did not abuse its discretion in appointing the Department as the managing conservator of Child.  *In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (concluding no abuse of discretion in conservatorship finding where the evidence was sufficient to support termination of parental rights).  We overrule Mother's fifth issue.

### III. CONCLUSION

We affirm the trial court's parental termination order.


Rebeca C. Martinez, Chief Justice